And we will hear from counsel on Spalding Laboratories versus Arizona Biological Control. Thank you. I think your co-counsel is not seated yet. I mean your opposing counsel, rather. People are still moving, so. Okay, I'll wait. We don't start the clock quite that fast. All right. Thank you. Good morning again. May it please the Court. The central issue in this appeal is literal falsity. I say that because under this Court's decision in Southland, once literal falsity is established, the plaintiff has made a prima facie case for injunctive relief. And moreover, the defendant, the plaintiff is entitled to monetary relief without proof of consumer deception. So that makes literal falsity a loose pin issue. Now, when you compare Can I ask you, we don't have a lot of time, and I think that we've all spent a lot of time going through the record here, that you're, you lost a number of motions in limine, and then obviously the Court ruled adversely on the JMOL. The question I, motions in limine for the most part are, you know, we're going to be looking at them for abuse of discretion. So what I would like you to tell me, on the JMOL, let's just say you couldn't push the rock uphill on any of the motions in limine. Do you have enough in the record with, you know, because obviously evidence that didn't come in there is, you know, I'm going to, I'm not speaking for other people, would be helpful and would be relevant for you at that point. But the question is, let's just assume none of that comes in. Do you have enough in the record as it existed to survive the JMOL? Yes. And if you could point to me exactly what satisfies that. Yes. That's where the district court was wrong about what the district court was requiring of you. I understand your question, Judge Callahan, and that's the premise on which I was proceeding, because I understand the evidentiary rulings are under a different standard. When you compare what Farbico said in its ad and the evidence of what is in the record that was at the trial, what is actually true, actually, I think this is not a closed question. I have the ad here, and it's in several places in different, slightly different variations. I'm looking at the one on page 501. Here's what it said. It said first under the heading, what are fly eliminators? The second bullet says, fly parasites used by horse and livestock owners to eliminate flies before they hatch into annoying, disease-carrying adults. Then it explains how it works. And the second bullet says, Arbico's fly eliminators seek out their prey and destroy by feeding on and breeding within the contents of fly poopy cocoons. It has a picture of an emerging wasp, and it says in the caption, fly parasite emerging from destroyed fly cocoon ready to go to work for you eliminating flies. Then it has a box with the prices and the quantities. For two to five horses, which is sort of the standard unit of shipping for both companies, it describes 50,000 parasites, not 50,000 larvae, 50,000 parasites. And it represents, in the part that is really the center issue in the case, has the following representation, 10x, 10 times more insects than any other company for less. And it has a similar representation elsewhere, 10x more bugs. Now, the evidence that's in the record showed that these quantity comparisons were false. First, both parties provide 5,000 cocoons, approximately, in their shipments to take care of two to five horses. For the same, Arbico's product is made up of almost entirely, 90% of a species called nisoni. Nisoni is a multiple breeder, and it produces in each of its cocoons, on average, 10 larvae per cocoon. For 50,000 insects, wasps, to be produced, 100% of those larvae would have to hatch. And... Let's assume that that is false. Pardon? Let's assume that that is false. All right. Right. Do you have to show consumer confusion to defeat the JMOL? No. And under Southland, we do not. But we did, in fact, present evidence of consumer confusion. Well, I know some of it didn't get in. No, I'm referring only to the evidence that got in. Okay. And so what did we have in the evidence that got in on consumer confusion? We have the... Let me just jump to the correct part of my notes. We have evidence that adds up to the following proposition, that Arbico's customers believed that there were more bugs, 10 times more bugs, and switched in significant numbers from Spaulding to Arbico and also placed a lot of phone calls to Spaulding to ask about these ads and the comparisons, and that in the period, in the two years immediately after the ads began to appear and before they were enjoined by the district court, Arbico's sales skyrocketed. Did... Do you have to have a survey to show consumer... As a matter of law, do you have to have a survey? No, and we cited a number of cases in a brief where... Or is that the W1? On the Ninth Circuit law, what is the law regarding surveys and consumer confusion? I don't have it at my fingertips. Let me get it, and when I get back up, I'll give it to you. I hope. Let me ask you a question. If we agreed that because there's sufficient evidence in the record of literal falsity, we do not need to reach any of your evidentiary issues, do we? Well, not to reverse, but we've asked you to reach the evidentiary issues because this case would be retried, and we'd like not to have to come back. What issues would be retried? Pardon? What issues would be retried? The case would have... This case never got to the jury. Would you send it to the jury on literal falsity? That, in this circuit, is a jury question under Southland. Well, but if we did... All right. If we did say something about the motion, let's say if we said some of them were right, some of them were wrong on these facts, on a retrial, anyone knows that that's not going to be exactly the same. And so why wouldn't that just be advisory in the sense that... Because either side could put on... If you had a retrial, neither side would be bound to put on the same evidence at a motion in limine. A trial judge would do those again. Yes. You're asking me would there be value in evidentiary rulings. I mean, that's obviously a judgment you make issue by issue, but I think the answer is yes. The reason we briefed them was not only to show prejudicial error. In some cases, probably wouldn't be enough for prejudicial error, but to show you that it was important to get these issues clarified. Well, you're also, I think, using it to buttress why you think you need to go in front of another judge, too. That, too. But, I mean, even if, let's say, you convinced me that there was error on, you know, that something... I mean, I think, one, the judge said something about it wasn't relevant. Okay, let's say that I say, well, yeah, it is relevant. It is relevant. Then I could say that's error on this particular motion in limine, but that... But then a judge in the district court, if it were a different judge or something, would look at that and say, oh, now do I have to do the same? Well, you will have to.   I mean, I think that's the reason my conclusion, because the Ninth Circuit said that, even though it looks completely different, the motion in limine that I have right now. So, Kellyn, it seems to me that a relevance determination by this Court would... Apply to those facts, if they were exactly the same with those facts. Yes. But, I mean, even when trial judges... I mean, I know I've ruled on motions in limine, and then sometimes you change them in the middle of the trial because either someone opens the door somewhere and something that may not have been relevant becomes relevant or... Right. But here, I understand that. And, of course, I've had that experience and observed that occurring. But here, the ruling was the other way. The evidence was kept out, so there never was an opportunity to change... Let me just follow up with two questions, because I'm not sure you understood the import of my first question. And I'm not saying that we're going to do this. I'm not speaking for anybody. But if we were to reverse the JMOL and say these ads are literally false, you're saying we couldn't say that on this record because it must go to the jury, even if we were inclined to say as a matter of law, in fact, this is literally false, and therefore you didn't need a survey, which renders all those other rulings wrong. I sure did misunderstand your question. I know you did. I know. I know. I'm a former trademark lawyer, so I know. No. I think this Court could certainly say that no reasonable jury could find that these ads were true. And, in fact, I almost said that to you, and I didn't need to, but that is my view, that the facts we proved, and I'd like to go back just to one or two of them. The facts we proved established literal falsity beyond any reasonable dispute. And you could say that quite properly. And we could also say there was a tribal issue and JMOL shouldn't have been granted. You could do either. And let me just make the case for both in one breath. In addition to the point that I made earlier, that all of those insects would have to hatch, there was evidence that 30 percent, that there was a 30 percent mortality rate in this type of insect, Nasonian. So that alone creates literal falsity. Secondly, the 10X representation would not be true even if every single one of their insects hatched, because there was evidence as well that Spalding's product had two insects that emerged on average for their cocoon. So that would produce 10,000 insects compared to 5,000 or if the 50,000 or if the 30 percent mortality figure is 10,000 versus 35,000, a long way from 10 times. So there's literal falsity as a matter of law, I believe. Well, there was also evidence of a mix of species in Arbicose. Yes, and that helps us because the other breed, the other 10 percent are less prolific breeders. And so that would only exacerbate the falsity of their representation. I think if I am going to have any time to reply, I should sit down. I just want to say, so that I'm not phrasing this for the first time, about the request that there be another judge. That was not made lightly. I think you know that. I mean, that's pretty major. Pardon? That's a pretty major request. It's a major request. I've never made it in 44 years of law practice. I've never made it before. I hope never to make it again. I just have to tell you that in reading this record and living it for the trial lawyers, all of us, the client, the trial lawyers who were there and appellate counsel who were not, were left with the very discomforting feeling that the plaintiff didn't have a fair trial and that for whatever reason this judge in this case, making no broader statement, lost his impartiality. And there is no more corrosive feeling for a lawyer or a litigant to have, and that's why we made the request. All right. Thank you. Good morning, Your Honor. Jan Shilton for the responding party. Let me start off just very briefly where my esteemed opposing counsel left off. The reason he gets that disturbing feeling is because Spaulding tried this case in a way that justified the way it was treated below. And you can see that. Can I just ask a question? It was not the trial – who was the lead trial counsel? For whom? For Spaulding. Mr. Blocker. Okay. Is Mr. Blocker deceased? No. He is deceased? No. You may not know this. Mr. Blocker was killed in a ski accident a short way after. Pardon me? I thought I saw a footnote in the brief to that point. I apologize, Your Honor. I was unaware of that. So what I gather is that maybe there was some antagonism between – No, I don't think that's the problem. The problem is, and you can see it right here, Justice – Judge Callahan's question really got us going in the right direction. We had eight days of trial. And here we're talking about two answers. Well, we only have 15 minutes, so. No, no, no. I mean, we've read all the briefs. My point is that the substantial evidence that they say supports their case and makes JMOL improper is two answers out of eight days of trial. There was a reason this judge was provoked, because Spaulding spent eight days of trial on other stuff. Now, let's talk about the two answers. The quantity claims here – before I get there, let me just answer another question that you asked, Your Honor. Can you determine as a matter of law that these ads are false? The answer is absolutely not, because we never presented any evidence. We at least have the right to present evidence. That's a good point. Thank you. So I don't think that's even in the ballpark. But let's talk about quantity claims first. Fifty thousand. If the ad means what we say it means, larval bugs – parasites is the word used – and if that means or could reasonably mean larval bugs, it's literally true, and plaintiffs admit that in their brief, page 32, I believe. The opening brief. There's no question that that's true. The question is, does it mean emerged adults? And on that question, they rely on one answer of Dr. Peterson, who said not that it's false, but that it was highly improbable, nearly impossible, because of the die-off factor that Mr. Falk mentioned. Now, the problem is that Mr. Peterson – Dr. Peterson never did any testing himself. He didn't look at test results. He was asked – that one answer was given in response to a hypothetical question. And the hypothetical was, if you're given 5,000 cocoons, how – is it possible to have 50,000 emerged adults? But they didn't prove the underlying facts to support the hypothetical. In fact, Mr. Fry testified that at least 5,000 cocoons were shipped in the case shipment amount that we're all talking about, and perhaps more. And there was evidence that despite some evidence about an average of 10 larvae per cocoon, Dr. Peterson admitted that the Nessonia insect could produce 15 or even 22 larvae per cocoon. Mr. Fry testified that there were at least 10, but probably more, per cocoon. The testimony that I'm talking about is found on page 1507 for Dr. Peterson and for Mr. Fry on pages 1343, 1353, and 1355-58. So that's one of the two answers that we're talking about. What I don't understand is, to me, quite clearly, some of the evidence that the district judge excluded on the basis that it was not relevant, it just seems so obviously relevant. Now, that doesn't mean that it gets in automatically because something's relevant. But if I think that the court was wrong saying that it's not relevant, how does that factor into an abuse of discretion? Because, I mean, if your reason for keeping something out is it's not relevant, and to me it looks very obviously relevant, and then, you know, abuse of discretion generally, if the court had said it's relevant but this is why I'm keeping it out, I think it, you know, maybe it would take too much time or maybe it's cumulative or any number of things. But to say it's not relevant and that's why you're keeping it out, if you – if a reviewing court disagrees with that, is that an abuse of discretion? I don't think so, Your Honor. I think, you know, when the appellant here points to relevance and says that was the only ground on which something was excluded, he's referring to very quick remarks in the transcript that was going at a rapid pace. These were sidebar conferences, and I think you have to presume in favor of the district court's ruling that it ruled on bases that were available to it at that time, both 401 and 403. And as we pointed out in our appellee's brief, on each of these issues, there were plenty of good reasons for keeping out the evidence that was, if Your Honor thinks so, marginally relevant. Let's take one example of evidence that seems to be relevant, which is the evidence of Arvika's past ads that referred explicitly to emerged insects and used the same quantities. Now, why isn't that relevant? It isn't relevant, Your Honor, because it doesn't prove the meaning of these ads or how consumers would – But if it shows that Arvika itself understood that these numbers related to emerged adult wasps as opposed to the, what, larvae, that – I know this whole subject. It's not breakfast conversation, Your Honor. But if that's the way Arvika understood those terms to be used in the industry, why wouldn't other people who were purchasing the product and selling the product understand the words to mean the same thing? The – for literal falsity in an ad, which is what we're talking about here, we're not talking about consumer confusion. No, I understand that. I'm understanding that. I'm just saying that would be relevant.  I'm just being careful and limiting my answer. No, I definitely understand. So what I'm saying is that it goes to how Arvika understood the terms that it was using in its ad. Right. And its understanding is relevant. No, it is. It goes to the claim. We have to identify what claim was Arvika making. Exactly, Your Honor. And how do you do that? You do it, as Southland Sod did, by looking at the advertisement itself, the full context of the ad itself. It is true, not just the eyes, the ears, et cetera, separately, but it's the ad itself. And there's a reason for that, because – Explain that to me factually, using 501, ER-501, which is the 2005 ad. You know, unfortunately, I don't have that picture or that page in front of me. You're welcome, Your Honor. Thank you so much. Factually, how do – Explain to me what – what is the claim that's being made in ER-501? That – well, literally, that 50,000 parasites are shipped for a price of $17.95. And what's the meaning of the term parasite there? Well, indeed, Your Honor. We say it means larval insects. And the reason we say that is, first, that the text above the quantity, if you look right in the middle of the page where it says how do fly eliminators work, the second paragraph says, as predator and parasite, they seek out and destroy by feeding on, okay, as well as breeding in, contents of fly pupae. Now, larvae feed on. Mature adults do not. But they don't feed on the flies that somebody is paying to kill. Unless they emerge. That is true. That's right. That is true. But this ad, just like the – as I said in our Appleese brief, advertises a biological product that is designed to produce an end result that's sold on the basis of what we can provide you. In other words, it's just like – I like dahlias. I'm sorry. Dahlia bulbs. If you go to an orchard supply hardware store catalog, you will see nice pictures of dahlia flowers to advertise the dahlias they sell you in bulb form. The bulbs don't do you any darn good if what you're interested in is flowers, unless they mature, obviously, into flowers. But the sale is made on the basis of the bulb count because, as is just as well true here, the supplier, the seller, has no control over what happens to the product after it leaves his premises. He can't guarantee how many adults will emerge because it depends on where you throw the larvae, whether it's a sunny day when they get out there, what happens in shipping. There's all kinds of events that can occur. Even when we get around to Dr. Peterson and the Donahue test and the Husky test, none of those tests tested what the consumer receives because there's no practical way for doing that. Well, now, why isn't that, though? That doesn't make them irrelevant. It doesn't go necessarily to the admissibility. It goes to the weight, and that's why you cross-examine people. Wait a minute. We're shifting gears on me. I was answering a question about why the prior ads are irrelevant. Because they don't show what the meaning of this document is, and because when consumers read this document, they don't have the prior ads in front of them, and there's no showing by consumer survey or otherwise that they would associate this year's ad with something that was said two or three years ago. That is the sort of thing that must be shown by consumer survey. It doesn't – it is not the kind of context that Salfonsad was talking about for literal falsity. Okay? And since we don't have the consumer surveys, the prior ads are not relevant to proving the case of literal falsity. But what does it say about what Arbico thought? They're both Arbico ads. What Arbico thought is unimportant. It doesn't prove literal falsity. You can think anything you want. It's what you say that counts. Right, but tell me, is there any dispute that each package that was sold has 5,000? Or more. Wait, not – okay, not emerged. 5,000 – what is it, pupae? Pupae, yes. Pupae, okay. 5,000 or more pupae. Or more. Now, when does it say that in the ad? I'm sorry? Does it say that in the ad? No. It doesn't talk in terms of pupae. So you're saying the ad talks in terms of emerged insects? No. It talks in terms of larvae. I'm sorry. Let's get our terminology straight. Pupae are the flies, okay? Pupae are infected with the wasp larvae. So we're talking about – so each package has 5,000 wasp larvae. No. No. 5,000 or more fly larvae in which there are 50,000 or more wasp – I'm sorry, I got confused. Let me try this again. Confusion's not a good word to use here. What? Confusion's not a good word to use in this type of case. Well, you can't survey me, so – it's 5,000 or more fly pupae. I got it right this time. 5,000 or more fly pupae in which there are 50,000 or more – It's wasp pupae. No. Oh, I see. That's the mistake, Your Honor. Okay. What are you selling? What exactly are you selling? Me? My case. But – Your client. Arvico sells wasps. The way they are shipped is in larval state in a fly pupae. Okay. Okay? So the count is larvae per fly pupae. There are 5,000 fly pupae in the shipment or more. There are 10 or more larvae per pupae. For pupae. If I'm Latin right. Okay, for a total of 5 times 10 or 50,000. Okay? But it's pupae are the flies, larvae are the wasps. Okay. Okay? Goodness. Thank you. And now I'll get my Ph.D. Let me turn to the other answer on which plaintiffs depend for their attack on the JMOL, and that's Mr. Spalding's volunteer non-responsive answer. Oh, I'm sorry, Your Honor. All right. Did I just tell you over your time that I'm going to let you go beyond your time to finish this point? Okay. As we pointed out in our appellee's brief, this was not brought to the attention of the trial court, district court, in opposition to the JMOL. Quite the contrary when asked at the JMOL hearing whether he had any additional evidence of literal falsity, Mr. Blocker said no. He didn't point to this. So it's not properly before the court. And moreover, Mr. Spalding was explicitly excluded as an expert. He has no personal contact with the bugs he shifts. They're bred by Cynthia Pan and shipped by her. Well, when you say it's not properly before the court, we still have to look de novo as to what the evidence is and decide whether the JMOL was properly granted or not, right? It is a de novo standard review. So whether he makes the argument, you know, I mean, we could make the argument if we wanted. True. If you thought, you know, that's, I mean, we're going to look at it. True. But the standard on JMOL is not just is there an answer anywhere in the record that marginally might support, you know, not a mere scintilla, but whether a reasonable jury considering or judge considering all of the evidence could reach a reasonable verdict in favor of the plaintiff in this case. And so I think it's a common sense argument that the JMOL is not a standard  It's a standard review based on this one offhand remark slipped in, in an effort to create a record. Thank you, Your Honor. All right. Thank you, counsel. Mr. Callahan, to your question, you mentioned Group W. I was thinking William Morris. It's William Morris v. Group W is the case that does not require a survey in order to find deception. Is it confusion? Confusion or deception? Confusion. I may be wrong in using the words interchangeably. I meant confusion. The – I think I was wrong as well, Judge, in my answer to your question. They didn't get a chance to put on their case, and I think I was hasty in my answer. Right. I think you can probably say on this – I think you can say on this record that the ad, which you can look at, even without the evidence that was excluded, that was colloquy about, just the ad on its face is referring to emerged insects. No reasonable jury could read this ad and think that it was a representation about sleeping, unhatched, never-to-be-hatched bugs. And you asked – or Mr. Chilton referred to the ad that said 3ER501. It lists in the column under parasites the quantities. And so for two to five horses, the standard shipment is 50,000 parasites. You know what parasites is from other parts of the ad. And so the ad is a representation of an emerged wasp. Now, Mr. Chilton didn't refer to this, but it's the picture of an emerged wasp with the caption fly parasite emerging from the – Is this the one that has free shipping under it? Is that – Yes. Exactly. That's the one you're looking at? Yes. And then it describes parasites as fly laminaries that, quote, seek out their prey. It's impossible to seek out anything if you haven't hatched, if something hasn't hatched. And so there's not any reasonable dispute. No jury could read this any other way. On that point, we persuaded the district judge, and I think that you could say that, but I agree with Mr. Chilton that otherwise they're entitled to put on their evidence. I understood Mr. Chilton to say that there was no evidence that there was only 10 on average because Mr. Fry testified that it could be more than 10. Well, there was disputed evidence on this because Mrs. Fry said in her testimony at volume 9, page 2006 of the ER, after being in this business for so long, we observed what is in our pupae, which is on average 10 undeveloped insects per pupae. So that is – and, of course, the excluded evidence is that on their test showed that it was – that six of those 10 hatched. That is the evidence that – of Ms. Husky that was excluded inexplicably. I think I have covered – if there are no other questions, I'm happy to see you. All right. Thank you, counsel. Thank you for the argument. Spalding Laboratories v. Arizona Biological Control is submitted.
judges: Canby, Wardlaw, Callahan